**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3576-19

ASMAR FORTNEY,

     Plaintiff-Respondent/
     Cross-Appellant,

v.

RUTGERS, THE STATE
UNIVERSITY OF NEW JERSEY,
RUTGERS UNIVERSITY POLICE
DEPARTMENT, CHIEF CARMELO
V. HUERTAS, individually and in his
official capacity, CAPTAIN
MICHAEL REIN, individually and in
his official capacity, Executive
Director of Police Services/Chief of
Police KENNETH COP, individually
and in his official capacity, and
former Vice President for
Administration and Public Safety
JAMES "JAY" KOHL, individually
and in his official capacity,

     Defendants-Appellants/
     Cross-Respondents.

_____

Argued October 26, 2022 – Decided October 22, 2024

Before Judges Accurso, Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3570-14.

James P. Lidon and Seth Spiegal argued the cause for appellants/cross-respondents (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; James P. Lidon, of counsel and on the briefs; Seth Spiegal, on the briefs).

Catherine M. Elston argued the cause for respondent/ cross-appellant (C. Elston & Associates, LLC, attorneys; Catherine M. Elston, of counsel and on the briefs; Cathlene Y. Banker, on the briefs).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Rutgers, the State University of New Jersey, appeals from a jury verdict finding the University violated plaintiff Asmar Fortney's procedural due process rights under the New Jersey Constitution and awarding him $340,000 in backpay and $150,000 in emotional distress damages for a total award of $490,000. Fortney cross-appeals from the jury's no-cause verdict on his race discrimination claim under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49, and the court's entry of judgment on his punitive damages claim and his claim under the New Jersey Civil Rights Act, N.J.S.A.

10:6-1 to -2, as well as from its directed verdict for the individual defendants on his due process and aiding-and-abetting claims.

We reverse the judgment on Fortney's due process claim. Fortney's exclusive remedy for any claim the University violated Departmental disciplinary policies or transgressed procedural safeguards associated with discipline under the collective negotiations agreement governing his employment was binding arbitration under the auspices of the Public Employment Relations Commission, a remedy he initially pursued but then abandoned. His procedural due process claim should have been dismissed on the pleadings. We affirm the judgments challenged on the cross-appeal finding no error in the trial court's rulings.

Following his training at the police academy and a short stint as a probationary officer, Asmar Fortney became a member of the Rutgers University Police Department in April 2011, assigned to the Newark campus. Before the altercation in December 2013, which gave rise to his termination and this suit, Fortney had already amassed a record of several sustained charges of unprofessional conduct or conduct unbecoming a police officer and had served suspensions totaling 420 hours. He received a four-day, forty-hour suspension in June 2011 for leaving his off-duty firearm unsecured by the

microwave oven in the squad room; failing to provide backup by leaving an incident scene he believed was being adequately handled by other officers from Rutgers and the New Jersey Institute of Technology; failing to confirm he had completed his search of the campus library after its midnight closing and secured all doors, following which other officers spotted and removed a homeless man inside; being unreachable on his police radio and riding in a NJIT police cruiser when he was supposed to be on foot patrol.

Six months later, in December 2011, Fortney received a two-day, twenty-hour suspension after he failed to write a required report after investigating the smell of burnt marijuana in a dormitory, leading to the University being unable to discipline students for the infraction. And nine months after that, in August 2012, he received a thirty-day, 300-hour suspension for falsely stating in a police report of a street theft on campus that he had reviewed video camera surveillance, which revealed nothing of evidentiary value, when he had not reviewed the surveillance video, which did contain footage of evidentiary value.

Michael Lattimore, then-Chief of the Newark command, who hired Fortney, was prepared to terminate him after that incident, and testified at deposition that he had the notice prepared to do so. Instead, Lattimore

4

determined to give Fortney one more chance and told him so. In his letter to Fortney advising of his thirty-day suspension, Lattimore noted it was "not the first time you have been disciplined by our department" and warned that "[a]ny future violation will result in the termination of your employment."

The incident leading to Fortney's termination began shortly after 1:00 a.m. on Sunday, December 7, 2013, when LaShelle Cross, an Area Director for the Rutgers Newark campus, arrived at University Square, a residence hall housing over 300 freshmen, in response to a call by two undergraduate Resident Assistants for help breaking up a party where students had been drinking. Cross testified at trial that Fortney was in the lobby, in uniform, speaking to the security guard on duty when she went upstairs to assist the RAs, who were dealing with a guest who didn't want to leave.

Cross testified the young woman was a commuter student, who said she'd just arrived at the party, and didn't have anywhere else to stay. Cross told her she had to leave. The student was agitated, not understanding why she couldn't stay as she hadn't been long at the party, and she was a tuition-paying Rutgers student with no place else to go. Cross testified Rutgers does not tolerate underage drinking on campus, that University Square is a freshman dorm, and that both the hosts and all the guests were in violation of the rules

A-3576-19

simply by being at a party where there was underage drinking, even if not all the guests were underage.

In the course of escorting the student and her host, who was pleading that the student be allowed to stay, down to the lobby, Cross learned the student had friends in an NJIT dorm a block away and confirmed she could stay there. There was a delay in her leaving, however, as she had forgotten her bag, and her host had gone upstairs to retrieve it. Cross testified the student, although willing to leave, albeit grudgingly, continued to complain to her in the lobby for the next five or ten minutes about the unfairness of the situation, while waiting for her things. Cross testified she was "pretty sure" the student was intoxicated. She claimed the student was "not willing to take no for an answer," and was just "looking for an argument." Cross claimed she finally motioned to Fortney, who was still standing at the security desk chatting with the guard and said hey "could you just tell her she has to go kind of thing."

Fortney, however, did nothing to assist Cross in having the student leave the dorm. The host offered to walk her guest up the hill to NJIT, and Cross determined to wait in the lobby until the host returned, making sure the guest had gotten "to where she needed to go," and her freshman host was back in the dorm. Cross testified she began a casual conversation with Fortney and the

A-3576-19

security guard as the two students made ready to leave during which Fortney questioned Cross about the University's housing policies.  As the two students walked outside, Cross testified Fortney said, "it's like see.  This is what I mean.  Like, why is that — you know, why is that a rule?"

Cross claimed Fortney expressed a "general disdain" for the way the housing staff "enforce[d] certain rules" and vented about "Anthony faggot ass and his RAs tr[ying] to get [him] fired," referring to the two-day suspension Fortney had received two years earlier for failing to write a report when called to a dorm to investigate the smell of burnt marijuana.  Cross testified Fortney said "'This is why I don't like housing.  I'm not fucking with y'all.  When I come to y'all events, I'm just going to sit on the side.'"  After the security guard told Fortney to "watch his language," Fortney responded by saying "'I don't give a fuck.  I got freedom of speech.  I can say what I want.'"

After Fortney told Cross that "'[s]ome of the stuff y'all do is dumb as hell.  That's why when I come to an incident, I don't even be fucking with y'all,'" she concluded the conversation and left the building.  Cross testified she didn't remember her "exact words but it was kind of like this is going nowhere.  I'm just going to, you know, end it here and call it a day."

7

The following Monday, Cross reported the incident to the Associate Dean for Housing and Residence Life. Cross testified she "didn't want to mess with anyone's job" or "get anyone in trouble" but she "didn't feel it appropriate [for a Rutgers police officer] to be challenging a [housing] policy in the middle of, like, a duty call" in the presence of undergraduate RAs. That, "coupled with some of the language and being in, like, a public space," led her to conclude she should share the incident with her supervisors. The Dean directed Cross to document the incident, and she personally walked Cross's report over to Chief Lattimore, resulting in the Department's investigation into the altercation. Cross testified she was interviewed during the investigation and provided the investigator with the information to which she'd testified.

Fortney didn't dispute Cross's description of the incident, other than to deny he used a homophobic slur to describe the former Area Director in the burnt marijuana incident from two years before. Fortney maintained he'd only referred to the Director as "a F'er" for "inserting his non-police abilities into official police business." Fortney also acknowledged his use of "several F bombs" during his conversation with Cross was inappropriate and inconsistent with his responsibilities as a Rutgers police officer. He maintained, however, that he was "passionate and frustrated" about Cross, whom he knew, enforcing

8

a housing policy that would put a student out of the dorm in the early hours of the morning. He testified he couldn't understand "how an adult [could] kick a young child out at that stage of the night."

Fortney reiterated on cross-examination that his priority that night was to clarify the housing policy and "protecting a young lady." After Fortney confirmed he was in uniform when speaking to Cross, and armed with a semi-automatic weapon with his police cruiser parked outside at the curb, counsel asked why instead of venting to Cross about University housing policy, he just didn't escort the young woman "to a place of safety?" Fortney replied that "it happened so fast, . . . the next thing you know she was out the building. And then by the time I thought of that, the . . . host that escorted her out of the building came back and says that she's safe."

Following an internal investigation in which Fortney was permitted to read Cross's complaint, although her name was redacted, and in which he produced for the investigator an email he had solicited from the commuter student "about [her] disdain of being kicked out of housing . . . that night" after he had "bumped into the young lady" on campus, he was served with a Preliminary Notice of Disciplinary Action advising the Department intended to terminate his employment for the conduct he admitted occurred in his

9

exchange with Cross. The charge alleging the homophobic slur was not sustained.

At the pre-disciplinary meeting that followed, Fortney's counsel offered a written statement contesting the charges and asked to see the evidence gathered in the internal investigation, which the Department had never previously provided to officers at pre-disciplinary meetings, notwithstanding a disciplinary process directive providing that "[t]he parties shall have the opportunity to review the evidence supporting the charges and make statements or provide additional facts which may impact the considered action(s)."[1] The meeting was adjourned to allow the Department to consider the request, and Fortney's counsel was subsequently advised to direct his request to the University's Office of Labor Relations, which never responded. Following the rescheduled meeting at which Fortney made no statement in his own behalf, the Department issued its Final Notice of Disciplinary Action terminating Fortney's employment effective April 3, 2014.

---

[1] Deputy Chief Rein testified at trial that the Directive was revised after Fortney's termination to clarify that officers are provided "the opportunity to review the statements of fact supporting the charges," not the evidence the Department had amassed.

 A-3576-19

Fortney's union, Fraternal Order of Police — Primary Unit, Lodge 62, is the exclusive collective negotiations agent for the University's police officers, and it and Rutgers were parties to a collective-negotiations agreement covering the period of July 1, 2006, through June 30, 2009, the agreement still in effect when Fortney was terminated following his altercation with Cross. The CNA provided in Article 5 that "[n]o officer shall be discharged, suspended or disciplined except for just cause," and "[i]n the case of any disciplinary action, the sole right and remedy under this Agreement shall be to file a grievance through and in accordance with the grievance procedure."

Article 7 of the CNA defined a grievance "as any difference or dispute concerning the interpretation, application, or claimed violation of any provision of this Agreement, or of any Rutgers policy or any administrative decision relating to wages, hours or other terms or conditions of employment of the officers as defined herein." After unsuccessfully grieving Fortney's termination through the first three steps of the grievance procedure provided in the CNA, the Union proceeded to step 4, submitting the grievance to binding arbitration on April 15, 2014.

On August 27, 2014, the Union requested that PERC appoint a panel of arbitrators. PERC promptly did so. After the Union forwarded its selection

11

from the panel to PERC, Rutgers advised on September 3 that it intended to file a scope of negotiations petition to restrain arbitration of the grievance on the ground that Fortney's termination was not arbitrable in accordance with State v. State Troopers Fraternal Association, 134 N.J. 393, 407 (1993) (holding major discipline of a police officer was a managerial prerogative not mandatorily negotiable as a term and condition of employment and thus not cognizable as a grievance subject to binding arbitration).  On September 4, the Union requested PERC stay the Fortney matter pending the Union's appeal of PERC's decision in another case involving major discipline of a different Rutgers officer, Edward Ruff.

In Ruff's case, PERC had granted Rutgers' scope petition, ruling the merits of Ruff's eight-day suspension was not arbitrable, even after the amendment of N.J.S.A. 34A:13-5.3 in 2003.[2]  The Commission found the language of the amendment plainly applied only "to unionized employees of the State of New Jersey," and that State Troopers continued to preclude binding arbitration of the merits of "major disciplinary disputes involving

---

[2] L. 2003, c. 119, § 2 amended N.J.S.A. 34:13A-5.3 to permit binding arbitration of disputes involving major discipline of unionized employees of the State of New Jersey, with the exception of the State Police, pursuant to the terms of any collectively negotiated agreement.

A-3576-19

police officers," including those employed by Rutgers. PERC further ruled that the only procedural argument advanced in the grievance contested Rutgers' decision to charge Ruff "with major rather than minor discipline." Finding Rutgers had "a managerial prerogative to impose discipline in the first instance," PERC "restrain[ed] arbitration over the [Union's] challenge to Rutgers' right to bring major disciplinary charges" against Ruff.[3]

---

[3] We subsequently affirmed PERC's decision. State Univ. v. FOP Lodge 62 (In re Rutgers), No. A-0455-14 (App. Div. Sept. 8, 2016) (slip op. at 1). Thereafter, Ruff filed a three-count complaint in the Law Division, alleging the University's disciplinary procedures violated his due process rights under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2, and the New Jersey Constitution; that the University had violated the Law Enforcement Officers' Protection Act, N.J.S.A. 40A:14-181, and the Attorney General Guidelines on Internal Affairs; challenging its "arbitrary, capricious and patently unreasonable conduct in the disciplinary process and the imposition of discipline, including violation of this State's policy of progressive discipline" and seeking compensatory and punitive damages, as well as attorney's fees. Ruff v. Rutgers, A-2549-16 (App. Div. Jun. 20, 2019) (slip op. at 5-6). The Law Division dismissed the complaint and denied Ruff's motion to amend to assert a breach of contract claim based on violations of the CNA, finding it expressly limited recourse against discipline to the grievance process, and that neither the Officers' Protection Act nor the Attorney General Guidelines on Internal Affairs were applicable. Id. at 10-13.

We affirmed on grounds of mootness, finding "[a]ll of the relief Ruff seeks stems from Rutgers' refusal to participate in step four of the CBA grievance procedure — a decision we already affirmed" and from which no appeal was taken. Ruff v. Rutgers, A-2549-16 (App. Div. Dec. 12, 2018) (slip op. at 4).

In her request to PERC to stay arbitration in this matter, counsel for Fortney, who also represented Ruff, acknowledged that the reasoning in PERC's decision in Ruff would apply in Fortney's case. She explained to PERC that "the filing of the request for arbitration on Officer Fortney's behalf was intended to preserve Officer Fortney's right to appeal in the event the PERC ruling" restraining arbitration in Ruff's case was overturned. PERC granted Fortney's request to stay arbitration pending Ruff's appeal.

In the meantime, however, on May 16, 2014, Fortney had filed a verified complaint in lieu of prerogative writs "for an order to show cause, summary action and demand for jury trial" in the Law Division alleging that by terminating his employment without having provided him "an opportunity to review all evidence in support of the charges and without a fair trial in a fair tribunal," Rutgers and the individual defendants had deprived him "of those

---

The Supreme Court granted Ruff's petition for certification and summarily remanded the case to us for decision on the merits. Ruff v. Rutgers, the State Univ. of N.J., 237 N.J. 174 (2019). We found the trial court did not err in concluding the CNA "expressly limits recourse against disciplinary action to the grievance process," and thus an amendment to assert a claim for breach of the CNA "would have been an exercise in futility." Id. at 10. We also agreed with the trial court that neither the Officers' Protection Act nor the Attorney General Guidelines on Internal Affairs applied and that Ruff's opportunity to challenge the discipline in a prerogative writs action was time-barred, thus, affirming on the merits. Id. at 10-16. The Supreme Court denied Ruff's petition for certification. Ruff v. Rutgers, 239 N.J. 491 (2019).

rights secured by the New Jersey Civil Rights Act, the New Jersey Constitution, and the Fourteenth Amendment of the United States Constitution."

Rutgers removed the complaint to the United States District Court on federal question grounds, 28 U.S.C. § 1331. Two of the individual defendants subsequently moved to dismiss the complaint on the basis of qualified immunity, arguing Fortney lacked a protectible property interest in his employment because the provision in Article 5 of the CNA, that no officer shall be discharged without just cause, was unenforceable. Judge Arleo denied the motion in January 2016, finding Fortney had sufficiently pleaded the individual defendants had violated his constitutional right to due process. See Richardson v. Felix, 856 F.2d 505, 507 (3d Cir. 1988) ("One who has been dismissed from public employment must make two showings to establish that the dismissal violated due process: (1) that the dismissal deprived him of a property or liberty interest, and (2) that the employer did not afford him adequate procedural protections in connection with the action.").

The judge found the law was well established that a contract, like the CNA, can provide a public employee with an interest in continued employment protected by the due process clause of the Fourteenth Amendment. See Board

15

of Regents v. Roth, 408 U.S. 564, 577 (1972).  She found the CNA's "just cause" provision created such a property right and that there was "no support" for defendants' argument that New Jersey law "has long rendered the 'just cause' language in the CBA unenforceable in matters involving major discipline imposed against police officers."  Judge Arleo acknowledged that "several decisions" by PERC "have held that the merits of major discipline imposed against officers are not subject to arbitration," but found "none of the PERC decisions or state court cases cited by defendants have held that the 'just cause' language in the [CNA] is unenforceable."

Following Fortney's voluntarily dismissal of his federal due process claim, this matter was remanded to the Law Division, and he filed an amended complaint alleging six causes of action arising out of his termination:  (1) violation of the New Jersey Civil Rights Act and his right to procedural due process under the New Jersey Constitution; (2) violation of the Law Enforcement Officers Protection Act, N.J.S.A. 40A:14-181, and the Attorney General Guidelines on Internal Affairs; (3) violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14; (4) violation of public policy and common law retaliation; (5) arbitrary, capricious and

16

unreasonable conduct in the disciplinary process; and (6) racial discrimination in violation of the LAD.

Following discovery, Fortney withdrew his CEPA claim. In March 2019, the court granted Rutgers' motion for summary judgment on all but Fortney's claims under the Civil Rights Act, the New Jersey Constitution, and the LAD. The court determined Judge Arleo's decision that Fortney had demonstrated a property interest in his employment to be the law of the case and that Fortney had demonstrated a material issue of fact on his LAD claim.

On the parties' in limine motions in February 2020, immediately before trial, the court granted Rutgers' motion to bifurcate the trial on liability and punitive damages and granted its motion to dismiss Fortney's Civil Rights Act cause of action because plaintiff had not asserted an equal protection or substantive due process claim that could be pursued under the statute. The court again denied Rutgers' motion to dismiss plaintiff's procedural due process claim.

Relying on our opinion in Plemmons v. Blue Chip Ins. Servs., Inc., 387 N.J. Super. 551, 566 (App. Div. 2006), the court found that in order to establish a procedural due process violation, Fortney needed to show that Rutgers "deprived him of a protected property interest and that the local and

state procedures for challenging the deprivation were inadequate." It further found that whether the provided procedures were adequate was a question of law for the court to decide, citing Harris v. City of Philadelphia, 47 F.3d 1333, 1338 (3d Cir. 1995).

The court ruled, based on law of the case, that Fortney had established a property interest in continued employment protected under the due process guarantee of our State Constitution. See Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985) (noting that although the phrase "due process" does not appear in our Constitution, article I, paragraph 1 safeguards "values like those encompassed by the principle[ ] of due process").

It also had no hesitation in finding the police disciplinary procedures in the Department's written directives, the preliminary and final disciplinary notices and the grievance procedure in the CNA were "constitutionally sufficient" under the three-factor test of Mathews v. Eldridge, 424 U.S. 319, 334 (1976). See In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 467 (2006) (cataloging the Mathews factors our courts often employ to decide what process is due, as the private interest affected by the official action; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute

procedural safeguards"; and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail") (quoting Mathews, 424 U.S. at 335).

Although satisfied those procedural safeguards were sufficient to protect Fortney's due process rights, the court held "the question of whether or not [Rutgers] violated the adequate procedures in place should be decided by a jury." See Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 682 (3d Cir. 1991) (noting "a court, not a jury, should decide whether the licensing scheme satisfied procedural due process," leaving for the jury the question of "whether the City violated the prescribed procedure in denying the licenses"), abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA, 316 F.3d 392 (3d Cir. 2003).

The trial consisted of several witnesses, including Fortney, Cross, the security guard and both RAs who testified to the altercation giving rise to Fortney's termination, as well as the Dean who reported the incident to Chief Lattimore, and those officers in the chain of command involved with Fortney's termination:  Captain Michael Rein, who assisted in finalizing the preliminary and final notices of disciplinary action; Chief of Police for the Newark

19

Command Carmelo Huertas, who succeeded Chief Lattimore and made the decision to terminate Fortney's employment; Kenneth Cop, Director of Public Safety for the University and Chief of Rutgers University Police, who approved the decision; and James Kohl, Vice President for Administration and Public Safety at Rutgers, whose portfolio included the Rutgers Police Department.

As to the LAD claim, Fortney did not present any evidence that some similarly situated white officer with a comparable disciplinary record had been treated more favorably than he had been treated. He had no direct evidence of racial discrimination and no comparator or other evidence on which to base a finding of pretext. See A.D.P. v. ExxonMobil Rsch. & Eng'g Co., 428 N.J. Super. 518, 531-35 (App. Div. 2012) (explaining a disparate treatment case may be proved by direct evidence of discriminatory animus under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), or circumstantial evidence using the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Fortney never even testified he believed race played a role in his termination. His theory instead centered on the departure of two senior African American officers in a reorganization of the entire Department near

the time of his termination, which he claimed was emblematic of a racist culture in the Newark command that led in some unexplained way to his firing.

Specifically, following the merger between Rutgers and the University of Medicine and Dentistry of New Jersey in 2013, there were two police chiefs in Newark, Chief Lattimore at Rutgers and Chief Huertas, Director of Public Safety and Chief of Police at UMDNJ, as well as Chief Cop in New Brunswick and Chief Guy Still in Camden. In February 2014, while the internal investigation of Fortney was still underway, Vice President Kohl, promoted Chief Cop to a new position, Executive Director of Police Services, supervising the chiefs in New Brunswick, Newark and Camden. Cop made Huertas the Chief of the Newark command, now including both the Rutgers and UMDNJ campuses, and laterally moved Chief Lattimore to Chief of the New Brunswick command. Cop testified he chose Huertas over Lattimore to lead the Newark command because of Huertas' experience in working with University Hospital, "by far our most significant generator of work and response in the Newark command." Cop also testified he believed that by moving Chief Lattimore to New Brunswick, he would have benefitted from Chief Lattimore's knowledge of the Newark command, which Cop had been newly assigned to oversee in New Brunswick where Cop kept his office.

21

That plan did not work out, however, because Lattimore, who didn't want to go to New Brunswick in the first place, chafed at having Cop over his shoulder as Lattimore settled into his role as Chief in New Brunswick. The two men had an argument about their respective roles in the first weeks of Lattimore's tenure. Cop charged Lattimore with insubordination and Lattimore resigned before the charges were finalized.

Lattimore, who had suspended Fortney for a total of 420 hours and given him his last chance warning, was Black, as were both internal affairs officers who investigated the various charges against Fortney, including the one that led to his termination. Lattimore testified at deposition that he'd almost fired Fortney for the falsification charge, and that there was no discrimination in the discipline of minorities while he served in the Newark command. Cop testified he approved Huertas' recommendation to terminate Fortney because he had never "seen a disciplinary history that extensive for someone who had been with the Department that short a period of time," and he noted other officers had been terminated for falsification of police reports without more.

Fortney also charged that Cop had precipitated the retirement of Chief Still, the other Black chief at Rutgers, who had served in Camden for forty years, twenty as Chief, by reassigning him to New Brunswick. Cop

22

acknowledged he had temporarily assigned Still to New Brunswick two-and-a-half-years after Fortney's termination, although Still never reported there. Still testified at deposition that Cop had asked him in 2016 to come to New Brunswick to assist him in running the New Brunswick command and reviewing various issues across all three commands. As Still had already decided to retire some months before, he testified he elected to accelerate his retirement date instead of reporting to New Brunswick. Still did not suggest that Cop pressured him into retiring or that race had anything to do with the decision. Lattimore and Still had both died by the time of trial; portions of their depositions were read into the record.

As already noted, the court directed a verdict in favor of Huertas, Rein, Cop and Kohl, finding no reasonable juror could conclude on the evidence presented that those individual defendants "provided substantial assistance" to Rutgers in racially discriminating against Fortney so as to subject them to "aiding and abetting" liability under N.J.S.A. 10:5-12(e). See Cicchetti v. Morris Cnty. Sheriff's Off., 194 N.J. 563, 595 (2008) (cautioning against confusing "the significance of a supervisor's act as a basis for an employer's liability with the significance of those same acts for purposes of the supervisor's individual liability"). The court also dismissed the punitive

damages claim finding "[t]he facts as presented . . . make it clear that no rational, reasonable juror could find by clear and convincing evidence that [Rutgers'] conduct was malicious." See N.J.S.A. 2A:15-5.12(a); Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 274 (2010) (noting the necessity of "sufficient evidence of especially egregious conduct" presented by the plaintiff "to get to the jury on the issue" of punitive damages).

The jury returned a no cause verdict on Fortney's LAD claim but found he had established by a preponderance of the evidence that the University provided him with constitutionally deficient process and that it had not demonstrated that Fortney would have been terminated even had the University afforded him constitutionally sufficient process, awarding him $490,000 in backpay and emotional distress damages.

Although a jury verdict is ordinarily entitled to considerable deference, Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011), the issue on Rutgers' appeal is whether Fortney stated a claim for denial of due process under our State Constitution cognizable in the Law Division, a question of law we review de novo. See In re DiGuglielmo, 252 N.J. 350, 359 (2022). The answer to that question is unequivocally no.

Although the issue is actually a very straightforward one, the parties' arguments have needlessly complicated the question and obscured the analysis. Rutgers has insisted on asserting an extreme position, without case support, that Fortney has no property interest in his continued employment, notwithstanding the "just cause" provision in the CNA, because he's had no forum in which he can enforce that right after State Troopers. 134 N.J. at 407 (holding as major discipline of a police officer is a managerial prerogative not mandatorily negotiable as a term and condition of employment, it is not cognizable as a grievance subject to binding arbitration). Whatever salience that argument might have had has been completely eroded by the Court's decision — affirming PERC's long-standing position — that police officers at public colleges and universities may challenge a termination in special disciplinary arbitration pursuant to N.J.S.A. 40A:14-209 and -210. DiGuglielmo, 252 N.J. at 354.

PERC has held that campus police officers could challenge their terminations in special disciplinary arbitration since passage of the act creating it in 2009, L. 2009, c. 16, §§ 1-16. DiGuglielmo, 252 N.J. at 367 ("Our holding is consistent with PERC's interpretation of special disciplinary arbitration eligibility and the manner in which PERC has administered this

form of arbitration since the enactment of the 2009 amendments."); In re NJIT, P.E.R.C. No. 2010-48, 35 N.J.P.E.R. ¶ 158, 2009 N.J. PERC LEXIS 258 (2009).  Thus, notwithstanding that Fortney did not choose to pursue special disciplinary arbitration, there was an arbitral forum available to him where he could seek to enforce the just cause provision of the CNA, and thus no support for Rutgers' claim that that the just cause provision that provided Fortney a protected property interest in continued employment is unenforceable.

Fortney, for his part, did not advise the several judges that have considered whether he could bring his due process claim in court that PERC has unequivocally held for nearly thirty years that although "the merits of [an] officer's termination may not be submitted to 'traditional' binding grievance arbitration," id. at 5, "claims asserting that a disciplined police officer was denied procedural rights," like the ones he asserts here, are subject to binding arbitration in accordance with the parties' CNA, In re Rutgers, The State Univ. and FOP, P.E.R.C. No. 96-22, 21 N.J.P.E.R. ¶ 356, 1995 N.J. PERC LEXIS 248, at *4-5 (1995).  See also In re Rutgers and FOP Lodge 62, P.E.R.C. No. 2017-17, 43 N.J.P.E.R. ¶ 35, 2016 N.J. PERC LEXIS 84, at *4-5 (2016) (agreeing with the Union, based on the same CNA as in this case, "that even if Rutgers' managerial prerogative to discipline the grievant is not arbitrable,

binding arbitration is permitted over the way the disciplinary proceedings were conducted"), aff'd, Rutgers & Fraternal Ord. of Police, Lodge 62, No. A-0990-16 (App. Div. July 27, 2018) (slip op. at 1) (agreeing with PERC "that only the procedural aspects of the dispute were arbitrable, that is, the claims relating to notice, an opportunity to be heard and the University's adherence to contractual investigatory and disciplinary policies and procedures").

Indeed, the Union made the same argument to PERC in Ruff, the case on which Fortney and the Union based their request to PERC to stay binding arbitration in this case, and which also involved the same CNA, asserting there "that the alleged violations of disciplinary procedures in the grievance are mandatorily negotiable." In re Rutgers University, P.E.R.C. NO. 2015-8, 41 NJPER 101 ¶ 35, 2014 NJ PERC LEXIS 83, at *7 (2014). The only reason PERC restrained arbitration entirely in Ruff was because "the procedural arguments made in the grievance" contested only Rutgers' "charging the grievant with major rather than minor discipline" in the first instance, a decision PERC ruled was within Rutgers' managerial prerogative. Id. at *12. We agreed PERC properly restrained arbitration entirely because the decision to charge an officer with major versus minor discipline is a managerial prerogative of the employer not an arbitrable dispute over disciplinary

procedure.  State Univ. v. FOP Lodge 62 (In re Rutgers), No. A-0455-14 (App. Div. Sept. 8, 2016) (slip op. at 1-2).[4]

As the United States Supreme Court has many times explained, "[p]roperty interests are not created by the Constitution."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985).  "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).  "The Fourteenth Amendment's

---

[4]  We cite our prior unpublished opinions involving the same parties litigating the same issue not for their precedential value, for they have none, but to note Fortney's failure to advise the federal court on Rutgers' motion to dismiss, or the Law Division on summary judgment or the in limine motions before trial of our having affirmed, on more than one occasion and in reviewing the same CNA, PERC's long-standing position that the procedural claims he filed in the Law Division were subject to binding arbitration under PERC's auspices. Because the case history is relevant to the issue before us, Rule 1:36-3's prohibition against the citation of unpublished opinions is not violated.  See Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 560 (2015).  We further note that although our prior holdings are not precedential, they are binding on Rutgers and the Union, the entity who petitioned PERC to stay binding arbitration in this case.  See Eherenstorfer v. Div. of Pub. Welfare, Dep't of Hum. Servs. of State of N.J., 196 N.J. Super. 405, 412 (App. Div. 1984) ("A party does not have the right to avoid a legal determination made by this court merely because a decision is unpublished.").

A-3576-19

procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits," id. at 576; here Fortney's interest in continued employment created by the "just cause" provision in Article 5 of the CNA that "[n]o officer shall be discharged, suspended or disciplined except for just cause."  Article 1, paragraph 1 of our own Constitution operates the same way.  Doe v. Poritz, 142 N.J. 1, 99 (1995).

As our Supreme Court has many times explained, identifying the protected property right interfered with is only the first step in the two-step process of examining a procedural due process claim; the second step requires an assessment of "whether the procedures attendant upon that deprivation are constitutionally sufficient."  Ibid.  "To assert a claim for a deprivation of property without procedural due process, 'the claimant must either avail himself of the remedies provided by state law or prove that the available remedies are inadequate.'"  Plemmons, 387 N.J. Super. at 566 (quoting Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 643 (1999)).

The reasoning is straightforward; "[t]he constitutional violation . . . is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."  Zinermon v. Burch, 494 U.S. 113, 126

(1990). Thus, the inquiry into whether a due process violation occurred includes an examination of "the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." Ibid. "A state cannot be held to have violated due process requirements when it has made procedural protections available and the plaintiff has simply refused to avail himself of them." Plemmons, 387 N.J. Super. at 567 (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).

The trial court found the "procedures in place, warnings of the . . . consequences for bad behavior, notice of termination and the hearings provided" satisfied the three-factor balancing test of Mathews for determining the process due prior to termination. Mathews, 424 U.S. at 335. We do not disagree with that finding, and Fortney has not appealed from it.

But it's not the whole picture. The Court in Loudermill defined the Mathews interests in the case of a public employee facing termination as "the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." 470 U.S. at 542–43. The Loudermill Court held that "before being fired a public employee

dismissible only for cause" was entitled to a pretermination process — which "need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story" — "to be followed by a more comprehensive posttermination hearing." Gilbert v. Homar, 520 U.S. 924, 929 (1997).  Although the trial court correctly understood Fortney's claim that he was deprived of the evidence necessary to defend himself in the pre-determination hearings, it failed to consider whether there were post-termination remedies provided to Fortney for that alleged due process violation and whether he had availed himself of them.

Because Fortney's right not to be dismissed without just cause is contained in the CNA between the Union and Rutgers, it is there we look for his post-termination remedies in the dispute resolution mechanism the Union negotiated and the relation of that mechanism to the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 to -39.  Article 5 of the CNA not only provided that "[n]o officer shall be discharged, suspended or disciplined except for just cause," but also that "[i]n the case of any disciplinary action, the sole right and remedy under this Agreement shall be to file a grievance through and in accordance with the grievance procedure."  The CNA defined a grievance in Article 7 "as any difference or dispute concerning the

interpretation, application, or claimed violation of any provision of this Agreement, or of any Rutgers policy."

There can be no question but that Fortney's claim that he was not provided the evidence supporting the charges against him in violation of a Department disciplinary process directive and his due process rights qualified as "a grievance" under the CNA. The Employer-Employee Relations Act requires public employers to negotiate grievance procedures by "which their employees or representatives of employees may appeal the interpretation, application or violation of policies, agreements, and administrative decisions affecting them," permits such grievance procedures to "provide for binding arbitration as a means for resolving disputes" and "mandates the use of the grievance procedures established by the collective negotiations agreement 'for any dispute covered by the terms of such agreement.'" Saginario v. Attorney Gen., 87 N.J. 480, 491 (1981) (quoting N.J.S.A. 34:13A-5.3) (emphasis added).

Although Fortney and his Union resorted to the grievance procedure — unsuccessfully grieving Fortney's termination through step 3 of the process and initiating binding arbitration in step 4 — the Union, through the same counsel who has represented Fortney throughout this matter, petitioned PERC to stay

32

binding arbitration while the Union appealed the grant of Rutgers scope petition in Ruff. Despite our affirmance of PERC's decision in Ruff, the Union never reactivated its step 4 grievance in this matter, thus never proceeding to binding arbitration of Fortney's claim that he was denied the evidence supporting the charges against him in violation of a disciplinary process directive as required in the CNA.

Fortney's failure to pursue the due process protections provided him in the CNA bars his due process claims here. See Snitow v. Rutgers Univ., 103 N.J. 116, 124 (1986) (dismissing Superior Court action challenging University's method for awarding tenure, holding "while the substantive criteria for determining tenure status are not negotiable in this public-university setting, the parties may negotiate the procedural process to be followed in making such a decision," thus making the dispute over the procedure subject to the negotiated grievance procedure).

The Union and Rutgers bargained for an arbitrator "to be chosen jointly" from a list of ad hoc arbitrators provided by PERC "from its panel of experts in public employment dispute settlement" to decide whether Fortney was entitled to the evidence supporting the charges against him at the pre-termination

33

hearings and, if so, what should be the remedy, not a jury.[5]  Fortney had no

right under the CNA, from which all his rights flowed, to bypass that

procedure by filing a Superior Court action.[6]  As we held in <u>Plemmons</u>, "[a]

state cannot be held to have violated due process requirements when it has

made procedural protection available and the plaintiff has simply refused to

avail himself of them."  387 N.J. Super. at 567 (quoting <u>Alvin</u>, 227 F.3d at

116).  "If there is a process on the books that appears to provide due process,

the plaintiff cannot skip that process and use the . . .  courts as a means to get

---

[5]  Fortney's counsel argued to the jury in her opening statement that due
process required a hearing before "an unbiased, independent hearing officer,"
and he instead got Chief Huertas and Director of Public Safety Cop, asking the
jurors, "Is that fair?"  Whether fair or not, it is what the grievance procedure in
the CNA negotiated by the Union provides for in the first two steps of a
grievance.

[6]  The rule could not be otherwise in light of New Jersey's strong public policy
favoring arbitration to settle labor-management disputes.  <u>Cnty. Coll. of Morris
Staff Ass'n v. Cnty. Coll. of Morris</u>, 100 N.J. 383, 390 (1985).  As the
Supreme Court has noted in a different context, a rule that "would permit an
individual employee to completely sidestep available grievance procedures in
favor of a lawsuit has little to commend" it, as it "would deprive employer and
union of the ability to establish a uniform and exclusive method for orderly
settlement of employee grievances."  <u>Republic Steel Corp. v. Maddox</u>, 379
U.S. 650, 653 (1965).  As the Court noted, a grievance procedure that "cannot
be made exclusive . . . loses much of its desirability as a method of settlement.
A rule creating such a situation 'would inevitably exert a disruptive influence
upon both the negotiation and administration of collective agreements.'"  <u>Ibid.</u>
(quoting <u>Loc. 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.
v. Lucas Flour Co.</u>, 369 U.S. 95, 103 (1962)).

back what he wants."[7]  Alvin, 227 F.3d at 116.  See also Dykes v. Se.

Pennsylvania Transp. Auth., 68 F.3d 1564, 1565 (3d Cir. 1995) (holding

"where an adequate grievance/arbitration procedure is in place and is

followed," even when the union elects not to pursue binding arbitration, "a

plaintiff has received the due process to which he is entitled under the

Fourteenth Amendment").

Our Supreme Court applied the same principles in Leang v. Jersey City

Board of Education, barring the procedural due process claims of a teacher

denied reappointment following expiration of her one-year contract based on

---

[7]  The Seventh Circuit has explained that "[t]he availability of recourse to a
constitutionally sufficient administrative procedure satisfies due process
requirements if the complainant merely declines or fails to take advantage of
the administrative procedure" has nothing to do with exhaustion of remedies.
Dusanek v. Hannon, 677 F.2d 538, 542-43 (7th Cir. 1982).  It simply expresses
"the logical proposition that a state cannot be held to have violated due process
requirements when it has made procedural protection available and the
plaintiff has simply refused to avail himself of them.  Because the procedural
protections existed, the state cannot be accused of withholding them."  Id. at
543.  See also Alvin, 227 F.3d at 116 (noting "exhaustion simpliciter is
analytically distinct from the requirement that the harm alleged has occurred.
Under the jurisprudence, a procedural due process violation cannot have
occurred when the governmental actor provides apparently adequate
procedural remedies and the plaintiff has not availed himself of those
remedies").

her failure to exercise "[t]hose statutory rights [that] are the embodiment of the process created by the Legislature through which plaintiff could seek to challenge and to be heard about the Board's non-renewal decision." 198 N.J. 557, 578 (2009). The Court found Leang "did not avail herself of those statutory rights [to receive a statement of reasons for the Board's decision not to renew her contract and demand an informal appearance before the Board to advocate for an offer of reemployment] and therefore failed to take advantage of the avenues of relief that would have afforded her the due process she now complains was denied to her." Id. at 578-79. The Court held it would "not permit" Leang to "expand upon her statutorily-protected right to be heard by authorizing her to pursue a claim that she was in some way deprived of due process in the Board's non-renewal decision." Id. at 579.

Because Fortney abandoned binding arbitration under the CNA to address the alleged procedural flaws in his termination, he is precluded from pursuing a claim in this action to secure the due process under our State Constitution binding arbitration under the CNA was designed to afford him. As Fortney's due process claim was not cognizable in the Superior Court, we will reverse the judgment entered in his favor and remand for entry of judgment for Rutgers.

Little need be said about the merits of Fortney's cross appeal. Although he has argued several errors: two alleged discovery errors; error in the jury charge on his LAD claim; dismissal of his aiding-and-abetting claim, his punitive damages claim, and his Civil Rights Act claim; and a host of claimed evidentiary errors at trial, including the court's unwillingness to allow testimony about an anonymous racial slur written on the wall of a bathroom stall, none has any merit.

Specifically, we find no error in the court's denial of Fortney's request for the internal affairs files for Public Safety Director Cop and Deputy Chief Rein following its in camera review of those files. The court denied the request in a six-page statement of reasons. In his brief on appeal, Fortney asserts those files were relevant to Rutgers' affirmative defense of maintaining an anti-discrimination policy without explaining why, or how, their absence prejudiced his case. Thus, we need not consider the argument further. See Nextel of N.Y., Inc. v. Bd. of Adjustment, 361 N.J. Super. 22, 45 (App. Div. 2003) ("Where an issue is based on mere conclusory statements by the brief writer, we will not consider it.").

The same is true of Fortney's request for comparator evidence, which the court entertained on more than one occasion. As the judge explained in

denying the motion for the last time, unlike with the files for Cop and Rein, Fortney never made a threshold showing sufficient to obtain in camera review of the close to seventy internal affairs files he requested for unidentified officers across all three campuses against whom a demeanor complaint had been filed during a two-year period. "Discovery is intended to lead to facts" to support a legal theory, not to find out if one exists. Camden Cnty. Energy Recovery Assocs., L.P. v. New Jersey Dep't of Env't Prot., 320 N.J. Super. 59, 64 (App. Div. 1999), aff'd o,b,, 170 N.J. 246 (2001). Fortney has provided us no basis on which to find the court abused its discretion in denying the requested discovery. See Cap. Health Sys., Inc. v. Horizon Healthcare Servs., Inc., 230 N.J. 73, 79-80 (2017).

Fortney also contends the court erred in charging the jury on his prima facie case of race discrimination under the LAD. To be sure, the Court has held that "[g]iven the confusion that often results when the first and second stages of the McDonnell Douglas test goes to the jury, we recommend that the court should decide both those issues." Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 473 (2000). In light of Mogull, the Model Jury Charge recommends the issue as to whether the plaintiff has made out a prima facie case of discrimination "should be handled, if necessary, in the context of a

motion for judgment pursuant to <u>R.</u> 4:40-1 at the end of the plaintiff's case, and should not be an issue for the jury." <u>Model Jury Charges (Civil)</u>, 2.21, "The New Jersey Law Against Discrimination" (approved May 2003). It further provides, however, "[i]n cases where an element of the prima facie case is in dispute . . . , the court must charge the jury on such issues based on the specific facts of the case." <u>Ibid.</u>

Although not having made the <u>Rule</u> 4:40 motion at the conclusion of plaintiff's case, Rutgers refused to concede at the charge conference that Fortney had established his prima facie case. As is evident from our sketch of the testimony adduced at trial, Fortney's discrimination case was weak. As already noted, Fortney did not testify his termination was motivated by race or recount any perceived racism in the Department. Having reviewed the trial transcripts, we cannot fault the trial court for putting to the jury whether Fortney "was terminated  . . . under circumstances that would give rise to an inference of discrimination." <u>Ibid.</u> As the charge adequately conveyed the law to the jury and was not confusing, we are satisfied any error was harmless. <u>Willner v. Vertical Reality, Inc.</u>, 235 N.J. 65, 79 (2018). Fortney was not entitled to a mixed-motive charge as he presented no direct evidence of discrimination. <u>See</u> <u>A.D.P.</u>, 428 N.J. Super. at 533-35.

Turning to those claims the court dismissed on motion, given the jury's rejection of plaintiff's LAD claim, which we affirm, there is no basis for aiding-and-abetting liability against the individual defendants. See Failla v. City of Passaic, 146 F.3d 149, 159 (3d Cir. 1998). And given our rejection of plaintiff's due process claim, neither is there a basis for punitive damages, even had plaintiff established a prima facie case for their imposition, which he did not. See Dong v. Alape, 361 N.J. Super. 106, 111-12 (App. Div. 2003). Although Fortney complains about the dismissal of his Civil Rights Act claim, a review of his third amended complaint makes clear he pleaded only a procedural due process claim for which the Act provides no relief. See Harz v. Borough of Spring Lake, 234 N.J. 317, 332 (2018).

Finally, having reviewed all of plaintiff's alleged evidentiary errors, including his claim that the court erred in admitting the "last chance" letter Fortney testified Chief Lattimore handed to him when the Chief spared his job — arguing it was not authenticated — we find no instance in which we can say the trial judge misapplied his considerable discretion. See Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). Plaintiff's remaining arguments, to the extent we have not addressed them, lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

40

We reverse the judgment for Fortney on his procedural due process cause of action and remand for entry of judgment for Rutgers on that claim. We affirm in all other respects.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3576-19